### The Dennis Valentine.

### Laverty et al. v. The Dennis Valentine.

(*District Court, D. Connecticut.* September 21, 1891.)

**1. Salvage—Amount of Compensation.**
A steam-lighter, upon her machinery becoming totally disabled, went ashore in New York harbor. A steam-tug, by request, came to her assistance as it was passing, and without danger to itself pulled her off, and towed her to a place designated. The lighter was not in imminent danger, and would in time have found other assistance. The tug was only engaged one and a half hours in the work, and its other business was not interfered with or injured. *Held*, that $100 was a sufficient allowance as salvage for the services of the vessel.

**2. Same—Costs.**
A libel for salvage was filed by the owners only of a vessel, and not also on behalf of the master and crew. When the answer was filed a tender was made and refused, which by the decree was held sufficient and awarded libelants, with costs up to the time the answer was filed, less the amount of claimants' costs since that time. The decree also provided that a certain amount should be paid the master and crew on the libel being amended so as to make them parties. *Held*, that the master and crew should not be allowed any costs except clerk's fees which accrued since the filing of the answer, since they were not parties to the libel before its amendment; and that, as they were not responsible for the refusal of the tender, their compensation should not be diminished by claimants' costs.

In Admiralty.

*Carpenter & Mosher*, for claimants.

*A. L. Shipman* and *J. A. Hyland*, for libelants.

SHIPMAN, J. This is a libel for salvage. The Dennis Valentine, a steam-lighter worth $5,000, on the morning of April 7, 1891, while on her way from Elizabethport to Stamford, Conn., with a cargo of iron water-pipes, worth, with the freight, $3,930, "slipped an eccentric," whereby her machinery was wholly disabled. The accident happened after the lighter had passed through Hell Gate, and was between the Middle Ground and Lawrence Point. Her captain thought it best to let the vessel drift ashore, which she did, and went ashore, about 9:20 A. M., about 100 feet southward and eastward of Woolsey's dock, heading eastward, and broadside to the shore, upon a bottom which was sand interspersed with cobble stones from the size of a man's head to 100 pounds in weight. The Valentine, with her cargo, drew about 7½ feet. The tide rises at this point about 7 feet, and was beginning to run ebb. The wind was north-west; there was a good sailing breeze, and the weather was fair. The captain caused the lighter to list inshore, and she lay easily and without pounding. Immediately after she grounded her captain signaled for help to the steam-tug Thomas Y. Boyd, which was coming to the westward with a schooner in tow. The Boyd heard the signal, but proceeded on her way, and when she reached Negro point, about a mile from Woolsey's dock, met the ferry-boat F. P. James, on her regular trip from Ninety-Ninth street to College Point. The master of the Boyd informed the captain of the James of the Valentine's mishap, and that she needed help. The James, a side-wheel ferry-boat, 147 feet long, went to the assistance of the Valentine, backed

towards her stern, threw a heaving line, which fell short, drifted down with the tide, approached the lighter a second time, threw another line which missed, when some one threw a line from the Valentine, which became fouled and missed. The captain of the James moved off for a third attempt, when he saw the Empire approaching with a tow, and supposing that she would go to the help of the Valentine, and do the work with less trouble and delay, therefore resumed his regular trip to College Point. The Empire, a steam-tug, worth $11,000, and a staunch and well-equipped boat, owned by the libelants, had at the time rounded Negro point, with a schooner loaded with stone in tow, and bound for Riker's island. The captain of the Empire saw the Valentine, and that the James was leaving her. With the permission of the schooner, he cast her off, collected his towage, proceeded forthwith at 9:35 A. M. to the assistance of the lighter, backed towards her, and threw a line, which missed. The Empire drifted by, backed again, came nearer than before to the lighter, again threw a line, which was caught, and a hawser was fastened from the bow of the Valentine to the stern bitts of the Empire. When the Empire got into proper position, and the captain had given a signal to his pilot by a jingle bell to crowd on steam, steam was crowded, and, after a pull of a minute or two, the Valentine was pulled off, and was towed, at her request, to Whitestone. The Empire was engaged in the help of the lighter about one and one-half hours. The Valentine received no damage. Her bottom was not scraped.

There are two controverted questions in the case. The first and most important is as to the extent of the Valentine's danger in case prompt help had not been given. The libelants are of opinion that there was a necessity for speed, or the attempt would have failed until the next high water, and that the lighter would have been in danger of serious injury if she had been compelled to stay aground till another tide. Tugs are constantly passing by Woolsey's dock, both from east and west, and the mishaps of the Valentine would not have been unknown. Some other tug would have gone to her assistance if the Empire had let her alone. Water does not fall at Woolsey's dock until one or two hours after high water, although the current is running ebb during that time. This is owing to the fact that the Sound tide and the East River tide run in opposite directions, and meet at Throgg's neck, and the Sound tide keeps the water high at the easterly end of the East river for one or two hours after the current begins to ebb. By the official tables, it was high water at Woolsey's dock on the morning of April 7th at 9:54. I think that in that abundantly frequented part of East river the Valentine would not probably have been compelled to wait for another tide. Promptness was, however, a matter of importance, because she had simply drifted ashore, and had touched bottom, and could be pulled off forthwith easily and without injury, whereas, if she should lie upon the ground for hours, she might suffer some injury which it would be expensive to repair.

The next point is as to the danger to the Empire, either of running aground while getting a line to the lighter, or of injury to her machinery. There was no danger of either calamity with an ordinarily skillful captain and engineer. They did the work with skill and energy.

Upon the foregoing facts, the Valentine being aground and helpless, and having made signs of distress, no question is made that the service was not one of salvage. The uncertain question is that of the proper amount of compensation, which is always uncertain, because there can be no fixed rule and standard of measurement. It was a service of value to the Valentine, because she was disabled and helpless, but she was in no serious danger of permanent injury. The promptness with which she was pulled afloat is a fact of importance, because delay and detention are sources of danger. The service was without danger to the Empire, was accomplished without interference with or injury to her other business, without delay, in waters where she lived, and was a business which was natural to her. The remark of Judge LOWELL in *The M. B. Stetson,* 1 Low. 119, is important:

"That a steamer, usually employed at remunerative pay, in towing about a harbor, does not stand precisely on the same footing, in respect to salvage, as a vessel kept on purpose for saving life and property, nor as a merchant or passenger steamer deviating from an important voyage to give aid, must also be admitted. The service, while a meritorious salvage service, calls for a low rate of compensation."

The claimants ask and the libelants consent that the master and crew of the Empire should be made parties libelant, in order to protect the Valentine against further claim. When the answer was filed, the claimants made a tender of $100 and the costs which had accrued to that date. This amount was an adequate one for the services of the Empire. Let a decree be entered in favor of the owners for $100 and the unpaid costs which had accrued at the time of filing the answer, less the costs of the claimants which have accrued since that date. When the amendment has been filed, let there be a decree in favor of the captain and crew for $50,—$20 to go to the captain and $30 to the crew in proportion to their wages, without costs, except the clerk's fees which have accrued since the filing of the answer. Inasmuch as the new parties are not responsible for the refusal of the tender, their compensation should not be diminished by the claimant's costs, but, under the circumstances of the case, they should not receive costs except for the clerk's fees which have accrued since the filing of the answer.

---

## ON REHEARING.

### (October 24, 1891.)

SHIPMAN, J. The motion for rehearing in regard to the terms of the decree upon the subject of costs is denied. As the libel stood before amendment, it was filed by the owners alone and not in behalf of all interested; and in order to allow a decree for the benefit of the master and crew, they should appear by petition, or by amendment. *The S. A. Rudolph,* 39 Fed. Rep. 331.

The point was strongly pressed by the libelants' counsel that if they had accepted the tender it would have been considered as a payment for the entire salvage services of vessel, master, and crew. The answer

admitted that the tug was entitled to a reasonable compensation, but denied the allegations of the fifth article of the libel in regard to the services of the crew. The tender was for "the value of the services rendered by the Empire," and the order for payment into court was to pay the sum of $100 "on plea of tender for services of the steam-tug Empire, as alleged in the libel."